RECEIVED
IN ALEXANDRIA, LA.

NOV − 5 2013

TONY R. MOORE, CLERK
DEPUTY

UNITED STATES DISTRICT COURT                    b

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

JOY A. JOLIVETTE,                     CIVIL ACTION
        Appellant                     NO. 2:12-CV-01740

VERSUS

U.S. COMMISSIONER OF SOCIAL           JUDGE JAMES T. TRIMBLE
SECURITY,                             MAGISTRATE JUDGE JAMES D. KIRK
        Appellee


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Joy A. Jolivette filed applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"), alleging a disability onset date of April 27, 2009 (Tr. pp. 69, 71) due to "bipolar, schizophrenia, manic depressant/anxiety/substance abuse" (Tr. p. 84).  Those applications were denied by the Social Security Administration ("SSA") (Tr. pp. 38, 42).

A de novo hearing was held before an Administrative Law Judge ("ALJ") on October 28, 2010, at which Jolivette appeared with a witness and a vocational expert ("VE") (Tr. p. 309).  The ALJ found that, although Jolivette suffers from non-severe impairments of affective disorder, anxiety disorder, status-post ventriculoperitoneal ("VP") shunt, and hypertension, she has the residual functional capacity to perform simple, unskilled work at all exertional levels (Tr. pp. 19, 26).  The ALJ concluded that, since Jolivette can perform her past relevant work as a cook's helper, she was not under a disability as defined by the Social Security Administration ("SSA") at any time through the date of the ALJ's decision on November 29, 2010 (Tr. p. 31).

Jolivette requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Jolivette next filed this appeal for judicial review of the Commissioner's final decision.   Jolivette raises the following issues on appeal (Doc. 15):

> 1.  The Appeals Council failed to follow its own procedures regarding plaintiff's submission of new and material evidence.
>
> 2. The ALJ's Step 2 non-severity finding is not supported by substantial evidence.
>
> 3. The ALJ's finding that plaintiff has at least a high school education is erroneous as a matter of law.
>
> 4. The ALJ denied plaintiff due process of law.

The Commissioner filed a brief in response to Jolivette's appeal (Doc 10), to which Jolivette replied (Doc. 11).  Jolivette's appeal is now before the court for disposition.

<u>Eligibility for Benefits</u>

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a).  Eligibility is dependent upon disability, income, and other financial resources.  42 U.S.C. 1382(a).  To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months.  Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful

employment that exists in the national economy. 42 U.S.C. 1382(a)(3).

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

<u>Summary of Pertinent Facts</u>

In 1997, Jolivette was evaluated by the Calcasieu Parish Schools Pupil Appraisal Services (Tr. pp. 129-133). It was noted that Jolivette had been previously evaluated three times, the last time in 1994, when she was 13 years old and in an ungraded middle school program (Tr. p. 130). At that time, Jolivette's classification of "other health impairments" was changed to "mental disabilities-mild" because she had been seizure-free for several years and was no longer taking medication (Tr. p. 130). Based on her previous IQ and adaptive behavior scores, Jolivette was functioning in the mental disabilities-mild range (Tr. p. 130). Jolivette was reading and spelling at the second grade level, was

doing math at the beginning third grade level (Tr. p. 133), and her adaptive behavior composite score was in the borderline range of functioning, commensurate with her intellectual testing and classroom performance (Tr. p. 134).  It was noted that Jolivette still had a shunt and saw a neurosurgeon annually (Tr. p. 130).

In 1999, Jolivette scored in the low to average ranges on an Iowa Test of Educational Development (Tr. p. 128).  Jolivette completed her high school special education classes in 2000 (Tr. p. 276); she did not pass the Graduation Exit Exam test (Tr. pp. 126-127).

In April 2009, when she was 28 years old, Jolivette was admitted to the emergency room due to depression, suicidal and homicidal ideations, post-traumatic stress disorder, and major depressive disorder-severe (Tr. pp. 169, 195).  Jolivette reported she had previously been charged with trespassing and possession of marijuana (Tr. p. 164).  Jolivette reported she had been physically and mentally abused by her mother, sexually abused by her step-brother from ages 9 through age 12, and mentally and physically abused by her father (Tr. pp. 157, 159).  Jolivette also reported she had completed high school and attended college in two different states for a total of four years each (Tr. pp. 157, 168).  A CT scan showed a VP (ventriculoperitoneal) shunt at the base of Jolivette's neck and large CSF (cerebrospinal fluid) collection in the posteromedial left cerebrum into which the shunt extended (Tr. pp. 203-206).  In May 2009, Jolivette's final diagnosis was major depressive disorder-severe (Axis I), hypertension and migraine

headaches (Axis II), and a GAF score of 50 to 70 (Axis V)[1] (Tr. p. 194), and she was prescribed Seroquel and Zoloft (Tr. p. 202).

Jolivette had a psychiatric evaluation by Dr. Lalitha Alla in June 2009 and was diagnosed with major depression with psychosis in remission, post-traumatic stress disorder, marijuana abuse/dependence, r/o malingering (Axis I), antisocial personality traits (Axis II), hydrocephalus, status post VP shunt, hypertension

---

[1] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning.  Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").

The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system.  The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR").  GAF is a standard measurement of an individual's overall functioning level.  The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness.  The first number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year.  DSM-IV-TR at 32-34.  The GAF scale goes from 0-100 and provides, in pertinent part: **71-80** - if symptoms are present, they are transient and expectable reactions to psycho-social stressors, not more than slight impairment in social, occupational, or school functioning; **61-70** - some mild symptoms OR some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships; **51-60** - moderate symptoms OR moderate difficulty in social, occupational, or school functioning; **41-50** - serious symptoms OR serious impairment with social, occupational, or school functioning; **31-40** - some impairment in reality testing or communication OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood.  DSM-IV-TR, at 34.  Also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

(Axis III), and a GAF score of 65 (Axis V) (Tr. pp. 211-212, 253, 254).   Dr. Alla prescribed Seroquel (continued), Zoloft (continued), Trazadone, and exercise three times a week (Tr. pp. 211-212, 254).

In August 2009, Jolivette was evaluated for daily headaches, blurred vision, unsteady gait, memory loss, nausea, vomiting, and fatigue (Tr. pp. 272-274).   She weighed 231 pounds (Tr. p. 272). Jolivette was prescribed Topamax (Tr. p. 274).   In September 2009, Jolivette was noted to have an unusual affect with multiple cysts in the occipital areas (Tr. pp. 265-266).

Also in August 2009, Jolivette was evaluated by Jerry L. Whiteman, a psychologist (Tr. p. 214).   Jolivette told Whiteman that she has a tumor in her head and, as a consequence, she cannot see (Tr. p. 214).   Whiteman diagnosed depression and marijuana abuse (Axis I), mild mental retardation, provisional (Axis II), and hydrocephalus with shunts (Axis III) (Tr. p. 217).   Whiteman measured Jolivette's full scale IQ at 51, but stated that her effort was poor so a true measure of her abilities was not obtained (Tr. p. 217).   Whiteman also stated that Jolivette displayed inconsistent or limited effort on most tasks, her posture was slouched, her attitude was very casual, she has a limited ability to maintain attention and address the tasks of daily living without assistance, and she appears to be a risk for mismanagement of her personal finances (Tr. p. 217).

In September 2009, Dr. Alla wrote that Jolivette still claimed to be depressed and denied hallucinations, but stated that a couple

of times she thought people were talking to her when they were not, and said she has double or triple vision sometimes (Tr. p. 252). Because Jolivette had gained 13.5 pounds in the last two to three months, Dr. Alla discontinued her Seroquel, increased her Zoloft and Trazadone, and added Abilify (Tr. pp. 252-254).

In November 2009, Dr. Alla noted that Jolivette denied being depressed until it was recommended that she find full or part-time employment, at which point Jolivette claimed she was still depressed and had "applied for a check," so she could not work (Tr. p. 251). Jolivette also stated that sometimes she hears voices, but not that day (Tr. p. 251). Dr. Alla wrote that she believes Jolivette is exaggerating her psychiatric symptoms for secondary gain (Tr. p. 251), recommended a healthy diet and exercise, and increased her Trazadone (Tr. p. 251).

In December 2009, Lucy Freeman, a psychologist, evaluated Jolivette's intellectual functioning by administering the WAIS-III IQ test and the ABAS-II test for adaptive functioning, as well as reviewing available medical records, to assist with Jolivette's treatment planning (Tr. pp. 141-143). Freeman noted Jolivette had a history of hydrocephalus since birth which has been treated with placement of shunts, she was treated as a mildly mentally retarded student in school and was in special education, she completed a two-month Job Corp program for training in food preparation but was unable to sustain employment (Tr. pp. 141, 143), and has been diagnosed with post traumatic stress disorder for the residual effects of untreated sexual abuse during her formative years (Tr.

7

pp. 141, 143). Freeman diagnosed Jolivette with mild mental retardation (full scale of 54), hydrocephalus, and post-traumatic stress disorder (Axis I), hydrocephalus/shunt placed at ages 6 days, 3 years, and 8 years (Axis III), psycho-social stressors of family conflicts and lack of "employment ability" (Axis IV), and a GAF score of 35-40 (Tr. p. 143). Freeman found that Jolivette functions in the extremely low range of intellectual ability, her adaptive abilities are in the mild mentally retarded range, and she lacks the capacity to make medical decisions or to care for herself independently (Tr. p. 143).

In December 2009, Jolivette was 5'2" tall and weighed 247 pounds (Tr. p. 255). She was examined for complaints of headaches (Tr. p. 255). A thyroid ultrasound showed a hypocchoic nodule at the thyroid isthmus (Tr. p. 258).

In May 2010, Jolivette was treated at the Lake Charles Mental Health Center by medical psychologist Craig Waggoner, who noted she vaguely reported occasional auditory hallucinations, but she was not sure they were not just her own thoughts, and she reported some paranoid feelings; Waggoner instructed Jolivette to walk a lot more and diet (Tr. p. 296). In September 2010, Waggoner found that Jolivette weighed 271 pounds and was going to see a dietician in October, discontinued Trazadone and prescribed Rozerem as a sleep aid, and instructed her to stop napping during the day (Tr. pp. 295, 298).

In October 2010, Faye Cook, the case management supervisor from Volunteers of America ("VOA"), wrote that Jolivette had been

receiving services from the VOA since July 2009, had participated in social-recreation activities and attended classes, regularly assisted with chores, and has a case manager who assists her with linkages to community resources and with maintaining mental health treatment (Tr. p. 275).

In April 2011, Jolivette was evaluated by clinical psychologist G. Jon Haag.  Jolivette had a full scale IQ of 61 on the WAIS IV, which Haag noted was comparable to the results obtained by Freeman in December 2009 (Tr. p. 307).  Haag diagnosed Jolivette with major depressive disorder in remission (Axis I), mild mental retardation (Axis II), and a GAF of 55 (Tr. p. 307).  Haag wrote that, adaptively, Jolivette needs minor assistance in managing funds and reliably completing activities of daily living (Tr. p. 307).  Haag also found that Jolivette appeared to be adequately treated with medications since her mood was stable and she had not experienced psychosis in nearly one year (Tr. p. 307).  Haag stated that the mood disorder diagnosis was based on history and that he had not determined that the psychosis diagnosis was accurate (Tr. p. 307).  Haag stated that, based on her mental status exam, Jolivette's memory was mildly impaired, her concentration was moderately impaired, and she appeared able to understand and follow simple instructions, but became easily confused as the instructions became even modestly more complex (Tr. pp. 307-308).

### 2. October 2010 Administrative Hearing

Jolivette appeared at her administrative hearing with a

witness (her mother) and a vocational expert ("VE") (Tr. p. 310).
Jolivette verbally waived her right to an attorney at the hearing
(Tr. p. 312).  Jolivette testified that she was 29 years old, had
completed the  twelfth grade in school and received a high school
diploma, and did not attend college (Tr. p. 313).   Jolivette
testified that all of her classes were in special education (Tr. p.
316).

Jolivette testified that she last worked for about six months
at the L'Auberge du Lac casino, cooking already prepared frozen
food (Tr. 313).  Jolivette testified that she cannot handle a job
because it is difficult for her to cooperate, and she is unable to
count money correctly and her drawer comes up short (Tr. p. 314).

Jolivette testified that she tries to go every day to classes
at the Volunteers of America to learn independent living skills;
the classes last all day, Monday through Friday (Tr. p. 314).
Jolivette testified that she has been going for about one and a
half years (Tr. p. 314).

Jolivette testified that she sees her psychologist, Dr.
Waggoner, every six months, and a nurse checks on her every month;
Dr. Waggoner prescribes medications that are helping her, but she
is still not able to work (Tr. p. 315).

A VE testified[2] that Jolivette's past work at the casino, as
she described it, was as a cook's helper, which is medium,

---

[2] The VE was not introduced by name or credentials at the
administrative hearing, nor was Jolivette given an opportunity to
ask him about his background or object to his qualifications (Tr.
pp. 316-317).  However, the VE's resume is included in the
administrative record (Tr. p. 65).

unskilled work, SVP 2 (Tr. pp. 317-318).   The ALJ posed a hypothetical involving a person of the same age, education and work experience as Jolivette, who can work at all exertional levels but has non-exertional limitations of being able to do only unskilled work where she is not required to learn a lot of new tasks on the job (Tr. p. 318).   The VE testified that such a person could perform Jolivette's past work as a cook's helper (Tr. p. 318).

Jolivette's mother, Sheila T. George, testified that Jolivette is her oldest child.   The ALJ required the witness to only testify in response to questions asked by Jolivette, who was essentially unable to formulate questions (Tr. pp. 319-320).

### ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).   The sequential process required the ALJ to determine whether Jolivette (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work.   If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.   A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.   Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

11

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Jolivette has not engaged in substantial gainful activity since April 27, 2009, that her disability insured status expired after June 30, 2009, and that she has non-severe impairments of affective disorder, anxiety disorder, status-post ventriculoperitoneal (VP) shunt, and hypertension, but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 19).  The ALJ then found that, from April 27, 2009 (protective filing date) through November 29, 2010, Jolivette was still able to perform her past relevant work as a cook's helper in a casino (Tr. p. 30).  The sequential analysis thus ended at Step 4, with a finding that Jolivette was not disabled (Tr. p. 31).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  McQueen v. Apfel, 168

F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981).  Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."   Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

## Law and Analysis

### Issue 1 – Appeals Council

First, Jolivette contends the Appeals Council failed to follow its own procedures regarding plaintiff's submission of new and material evidence.   Jolivette contends that psychologist Haag's report is new and material evidence.

The Appeals Council included Jolivette's new evidence in the administrative record, and stated that it "considered... the additional evidence" but "found that this information does not provide a basis for changing the Administrate Law Judge's decision" (Tr. pp. 1-2).  Since the Appeals Council considered the evidence in accordance with 20 C.F.R. 404.970, it implicitly considered Jolivette's evidence to be new and material.   Evidence submitted for the first time to the Appeals Council is considered part of the record upon which the Commissioner's final decision is based.  See Higginbotham v. Barnhart, 405 F.3d 332, 337 (5th Cir. 2005).  The Appeals Council's statement is sufficient to indicate it found Jolivette's evidence to be new and material.  Compare, Robinson v. Astrue, 397 Fed.Appx. 430, 432 (10th Cir. 2010).

Jolivette also cites Parsons v. Astrue, 2008 WL 3836569 (W.D.La. 2008), Report and Recommendation adopted, 2008 WL 5746961 (W.D.La. 2008), asking for identical relief (a remand).   In Parsons, the court found the Appeals Council erred in assigning no weight to the new evidence because of its source, and remanded for reconsideration of the evidence as a whole.  The holding in Parsons is not applicable to the case at bar.

14

Jolivette argues that Haag's evaluation indicates she meets Listing 12.05(C) because her IQ is below 70 and she suffers from major depressive disorder, in remission.

Listing 12.05 states, in pertinent part:

"12.05 Mental Retardation and Autism: Mental retardation refers to a significantly sub-average general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22)....The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

      *            *            *

"C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function;"

Listing 12.00(D) explains the IQ requirements as follows:

"In cases where more than one IQ is customarily derived from the test administered, i.e., where verbal, performance, and full-scale IQ's are provided on the WAIS, the lowest of these is used in conjunction with listing 12.05."

Haag found Jolivette's full scale IQ as 61. However, he found she suffers from "major depressive disorder, *in remission*," which means that she was not suffering from depression at that time. Apparently her depression is controlled with medication.[3] Therefore, Haag's report indicates that Jolivette's major depressive disorder does not limit her ability to work, so she does not meet Listing 12.05(C).

This ground for relief is meritless.

---

[3] "Remission" means "a state or period during which the symptoms of a disease are abated." MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: Remission, *available at* http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

Issues 2 & 3 - Residual Functional Capacity and Education

Next, Jolivette contends the ALJ's Step 2 finding, that her mental disabilities of affective disorder, anxiety disorder, post-traumatic stress disorder, major depressive disorder, and mild mental retardation are non-severe, is not supported by substantial evidence.  Jolivette also contends the ALJ's finding that she has a least a high school education is factually erroneous.

An impairment can be considered as not "severe" only if it is a slight abnormality which has such a minimal effect on the claimant that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.  Estran v. Heckler, 745 F. 2d 340, 341 (5th Cir. 1984).  See also, Anthony v. Sullivan, 954 F.2d 289 (5th Cir. 1992).

First, Jolivette correctly argues the ALJ's failure to address her mental impairment of mild retardation was an error.  The evidence showed that Jolivette's mild mental retardation is a severe impairment that affected Jolivette's ability to learn in school and continues to affect her ability to learn job skills.  Freeman and Haag were the only two psychologists who tested and measured Jolivette's IQ and adaptive functioning.[4]

The ALJ stated that he found Freeman's evaluation of Jolivette was not credible because it did not address the "issue" of malingering and she did not identify which of Jolivette's medical records she reviewed.  Freeman evaluated Jolivette's intellectual

---

[4] Although Whiteman attempted to measure Jolivette's IQ, he stated that his results were not reliable due to her lack of cooperation.

functioning by administering the WAIS-III IQ test and the ABAS-II test for adaptive functioning, as well as reviewing available medical records, and found Jolivette has a full scale IQ of 54, functions in the extremely low range of intellectual ability, her adaptive abilities are in the mild mentally retarded range, and she lacks the capacity to make medical decisions or to care for herself independently. Subsequently, Haag also measured Jolivette's IQ and found she had a full scale IQ of 61 on the WAIS IV, which Haag noted was comparable to the results obtained by Freeman in December 2009. Haag found that, adaptively, Jolivette needs minor assistance in managing funds and reliably completing activities of daily living. Therefore, Haag's findings (which were submitted after the ALJ's decision) support Freeman's findings.

It is further noted that, in childhood, Jolivette's IQ and adaptive behavior were measured through the school system and she was found to have mental disabilities in the mild range (Tr. p. 130). That evidence also supports Freeman's and Haag's evaluations and conclusions as to Jolivette's mental disabilities.

When the ALJ discounted Freeman's findings, he stated that Jolivette had lived "independently" and had attended college. However, a close examination of the medical records indicates that Freeman she lived with roommates, or her "fiancé," and there is some evidence that they took advantage of her financially. Moreover, as discussed below, since Jolivette did not graduate from high school (or receive a GED), she did not attend college.

Although the ALJ assigned great weight to Alla's and

17

Whiteman's evaluations, Alla did not measure Jolivette's IQ and Whiteman's IQ test results were unreliable.   The findings that Jolivette was uncooperative and malingering do not negate the fact that she is mildly mentally retarded.

For all of these reasons, the ALJ erred in dismissing Freeman's evaluation and findings as to Jolivette's mental limitations, and in according greater weight to Alla and Whiteman. The ALJ erred in failing to find that Jolivette's mild mental retardation is a severe impairment and in failing to consider her mental limitations arising therefrom.[5]

Jolivette also complains the ALJ found that her mental disabilities of affective disorder, anxiety disorder, post-traumatic stress disorder, and major depressive disorder are non-severe. As discussed above, Jolivette's medical records show that her major depressive disorder is in remission; therefore, it is non-severe.   The medical records also show that both Dr. Freeman and Dr. Haag noted Jolivette's history, but did not find and diagnose affective disorder, anxiety disorder, or post-traumatic stress disorder.   Therefore, the ALJ did not err in concluding those impairments are non-severe.

Finally, the ALJ erred in finding that Jolivette has "at least

_____

[5] Jolivette also contends the ALJ erred in finding that Jolivette has not shown that she suffered from a mental impairments that significantly limited her ability to perform basic work-related activities for twelve consecutive months (Tr. p. 19).   However, the ALJ's statement was not referring to her mild mental retardation, since the ALJ did not find she is mildly mentally retarded.   Moreover, as indicated by her school records, Jolivette's mild mental retardation began long before she attained 22 years of age.

a high school education" (Tr. p. 30).  Since the administrative record indicates quite clearly that Jolivette attended special education classes rather than regular classes, and has a certificate of completion from high school rather than a diploma, the ALJ erred in finding Jolivette has a high school education.  It is noted that the ALJ also found Jolivette had "attend[ed] school [college] in two different states" (Tr. p. 23).  Since Jolivette did not graduate from high school, she did not attend college.

The ALJ's hypothetical to the VE was flawed because it failed to include Jolivette's mild mental retardation and limited education.  However, Jolivette has not shown that she was prejudiced by this error because she has not shown that her past work as a cook's helper required her to have more education than she has; Jolivette received training for a job as a cook's helper from the Volunteers of America.  Moreover, Jolivette testified that she "cannot" work as a cook's helper because she has difficulty cooperating and because, when she worked as a cashier, her drawer kept coming up short.  Since work as a cook's helper does not involve counting money in a cash drawer, Jolivette's lack of that skill will not prevent her from working.  As pointed out by the ALJ (Tr. p. 29), the fact that Jolivette has been attending classes at the VOA all day, five days a week, indicates she is able to sustain an average work schedule.  Jolivette has not shown that she cannot return to her past work as a cook's helper.

Since Jolivette has not shown prejudice arising from these errors, this issue is meritless.

19

Issue 4 - Due Process

Finally, Jolivette contends the ALJ denied her due process of law because he considered her 1994 application for SSI which was "apparently denied" due to excess income (Tr. p. 29). The ALJ stated that the fact that Jolivette had "excess income" in 1994 indicates Jolivette is able to engage in substantial gainful activity (Tr. p. 29). The ALJ's assumption that Jolivette is able to work now because she had "excess income" in 1994 is ridiculous, given the fact that Jolivette was born in 1981 and was thirteen years old in 1994. Although her household may have had "excess income," it was not because Jolivette earned it.

However, Jolivette has not shown prejudice arising from that error. As discussed above, other evidence indicates that Jolivette is still able to work as a cook's helper. Therefore, this issue is meritless, also.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Jolivette's appeal be DENIED AND DISMISSED WITH PREJUDICE and that the final decision of the Commissioner of Social Security be AFFIRMED.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being

served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen(14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this ___5th___ day of November 2013.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE